## McAFEE v. OGDEN UNION RY. & DEPOT CO.

No. 3945.   Decided August 17, 1923.   (218 Pac. 98.)

1. COURTS—DEFENSE OF ASSUMPTION OF RISK TO BE APPLIED IN ACTION UNDER FEDERAL EMPLOYERS' LIABILITY ACT AS CONSTRUED AND DEFINED BY DECISIONS OF FEDERAL COURTS. In actions under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657-8665), the defense of assumption of risk must be applied as construed and defined by the decisions of the federal courts.

2. MASTER AND SERVANT—SWITCH STAND IN UNUSUAL PROXIMITY TO TRACK HELD NOT RISK ORDINARILY INCIDENT TO EMPLOYMENT. The negligence of having a switch stand in unusual proximity to a track, so that there was danger that employees riding on the side of box cars passing the switch stand would be likely to be struck and injured, *held* not a danger or risk ordinarily incident to the employment in railroad yards.

3. MASTER AND SERVANT—ASSUMPTION OF RISK BY BRAKEMAN INJURED BY SWITCH STAND HELD FOR JURY. Whether plaintiff brakeman injured, while riding on a ladder on the side of a box car, by being struck by a switch stand in unusual proximity to the track, assumed the hazard of an obvious danger, *held* a question for jury.

4. APPEAL AND ERROR—APPELLATE COURT WILL NOT INTERFERE WITH VERDICT IF EVIDENCE SUPPORTS IT. When there is substantial

evidence in support of every essential fact necessary to be established for a recovery, the appellate court is precluded from interfering with the verdict.

5. MASTER AND SERVANT—ASSUMPTION OF RISK AFFIRMATIVE DEFENSE. Assumption of risk is an affirmative defense, and the burden of proof is upon defendant.

6. APPEAL AND ERROR—UNIMPORTANT RULINGS ON EVIDENCE, THOUGH ERRONEOUS, HELD NOT GROUND FOR REVERSAL. Unimportant rulings in excluding evidence, though erroneous, are not ground for reversal.

7. TRIAL—INSTRUCTION CONTAINING PHRASE "UNUSUAL PROXIMITY OF THE SWITCH STAND" NOT GROUND FOR REVERSAL, WHERE SUCH SITUATION SHOWN AS MATTER OF LAW AND, IF ERRONEOUS, WAS CURED BY OTHER INSTRUCTIONS. In an action under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657-8665) for injuries received from a switch stand near a rail, an instruction using the words "unusual proximity of the switcn stand" to the rail *held* not ground for reversal, where under the evidence the court might well have found, as a matter of law, that the switch stand was dangerously near the track, but, if erroneous, *held* cured by other instructions.

8. TRIAL—CHARGE TO JURY MUST BE CONSIDERED AS WHOLE. A charge to the jury must be considered as a whole.

9. APPEAL AND ERROR—USE OF WORD "AND" INSTEAD OF "OR" IN INSTRUCTION HELD NOT GROUND FOR REVERSAL. In an instruction reading, "If the preponderance of the evidence fails to show that plaintiff knew of such danger and that such danger was obvious and apparent," use of word "and," instead of "or," between words "obvious and apparent," *held* not of sufficient importance to constitute reversible error.

10. APPEAL AND ERROR—USE OF WORD "AND" INSTEAD OF "OR" IN INSTRUCTION HELD NOT GROUND FOR REVERSAL IN ABSENCE OF OBJECTION BELOW. In an instruction reading, "If the preponderance of the evidence fails to show that plaintiff knew of such danger and that such danger was obvious and apparent," use of word "and," instead of "or," between words "obvious and apparent," *held* not ground for reversal, where no exception was taken at the trial.

11. APPEAL AND ERROR—INSIGNIFICANT ERRORS OVERLOOKED BY ALERT AND SKILLED COUNSEL DO NOT DEPRIVE DEFENSE OF SUBSTANTIAL RIGHT. When an error is so insignificant that it is overlooked

by alert and skilled counsel, it is not of sufficient importance to deprive the defense of any substantial right.

12. APPEAL AND ERROR—USE OF PHRASE IN INSTRUCTION HELD NOT GROUND FOR REVERSAL. In an instruction, use of the words "that he must of necessity have known it," instead of that "he must be presumed to have known it," *held* not ground for reversal, the difference between the two phrases being infinitesimal.

13. TRIAL—INSTRUCTIONS HELD NOT OBJECTIONABLE FOR USING EXPRESSION "AS A MATTER OF LAW." In an instruction in a personal injury action stating that "plaintiff is not chargeable, as a matter of law, with knowledge of the danger (if danger there was) by the mere fact that he knew of the existence and location of the switch stand," use of expression "as a matter of law" *held* not error.

14. APPEAL AND ERROR—OMISSION TO INSTRUCT JURY TO FIND PRESENT VALUE OF PLAINTIFF'S LOSS OF EARNINGS HELD NOT REVERSIBLE ERROR. In an action under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657-8665), instruction omitting to instruct jury to find present value of plaintiff's loss of earnings *held* not ground for reversal, where, if the court had supplied the omission and had furnished the jury with approved mortality tables and a standard discount table, the verdict would probably have been more than the jury allowed.

15. APPEAL AND ERROR—OMISSION TO CHARGE JURY ON PRESENT WORTH OF LOSS OF EARNINGS HELD NOT GROUND FR REVERSAL IN ABSENCE OF REQUEST FOR SUCH CHARGE. In an action for injuries, omission of court to charge jury on subject of present worth of plaintiff's loss of earnings *held* not reversible error, where no request for such an instruction was made.

16. APPEAL AND ERROR—OMISSION TO CHARGE AS TO PARTICULAR ISSUE IS NOT GROUND FOR REVERSAL IN ABSENCE OF SPECIFIC REQUEST FOR COMPREHENSIVE INSTRUCTION. Partial noninstruction or omission to charge as to a particular issue does not constitute reversible error in the absence of a specific request for a more specific and comprehensive instruction.

17. APPEAL AND ERROR—APPELLATE COURT WILL NOT DISTURB VERDICT AS BEING EXCESSIVE UNLESS EXCESSIVE AS MATTER OF LAW. Verdicts will not be interfered with by the appellate court on account of being excessive unless the facts are such that the excess can be determined as a matter of law, or that the verdict is so excessive as to be shocking to one's conscience and

to clearly indicate passion, prejudice, or corruption on the part of the jury.

18. NEW TRIAL—TRIAL COURT MAY REDUCE EXCESSIVE VERDICT IF NO PASSION OR PREJUDICE EXISTS. When a verdict is so excessive that it clearly indicates passion or prejudice, a new trial should be granted unconditionally, but if the trial court thinks, after seeing and hearing the witnesses and weighing the evidence, that the verdict is excessive, it may, in the exercise of a sound discretion, reduce the verdict, and, if the reduced amount is not acceptable the court may grant a new trial, and, unless an abuse of discretion is shown, such action is not subject to reversal.

19. DAMAGES—VERDICT OF $10,000 FOR LOSS OF FINGERS HELD NOT EXCESSIVE. Verdict of $10,000 to brakeman 31 years old, earning $200 a month, *held* not excessive for loss of four fingers, causing pain from exposed nerves and disabling him from using hand in manual labor.[1]

Appeal from District Court, Third District, Salt Lake County; *M. L. Ritchie,* Judge.

Action by D. C. McAfee against the Ogden Union Railway & Depot Company. Judgment for plaintiff, and defendant appeals.

AFFIRMED.

*George H. Smith, J. V. Lyle,* and *R. B. Porter,* all of Salt Lake City, for appellant.

*Marioneaux & Beck* and *Willard Hanson,* all of Salt Lake City, for respondent.

WEBER, C. J.

This action is brought under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657-8665). The substance of the complaint is: That defendant was engaged in operating

---

[1] *Coke* v. *Timby,* 57 Utah, 53, 192 Pac. 624; *Shepard* v. *Payne,* 60 Utah, 140, 206 Pac. 1098.

a railroad yard in Ogden, Utah, in interstate commerce, and that, at the time of the accident, plaintiff was employed in interstate commerce; that in February 22, 1921, while in the employ of defendant as engine foreman, he was riding on a ladder on the side of a box car, which was being switched onto a track, known as the south shopyard lead, for repairs, and while in that position he was struck by a switch stand and knocked off.

The negligence alleged was that the defendant carelessly and negligently maintained a certain switch stand about 4½ feet in height, fitted with a target revolving vertically, which switch stand the said defendant carelessly and negligently erected and maintained besides said south shopyard lead, and carelessly and negligently permitted the said switch stand to be erected and to be maintained so close to the west rail of said track that there was great, unusual, and imminent danger that any person riding upon the sides or ladders of any box car passing said switch would be struck and injured by the target of said switch; that there was not the usual and necessary clearance between said switch stand and the target thereof and said rail, or between said switch stand and the cars when the same were being moved upon the track and past the said switch; that while he was riding upon a ladder on the side of a car he was struck in the side by the target of said switch stand, knocked off the car, and injured.

In the answer, plaintiff's averments of negligence were denied. It was admitted that the plaintiff at the time was engaged in switching certain cars, in need of temporary repairs, on what is known as the south shoplead in defendant's yards, and that plaintiff was injured. The answer further pleaded contributory negligence and assumption of risk by plaintiff.

The jury returned a verdict in favor of plaintiff for $10,-000. From the judgment thereon entered, the defendant appeals.

The multitudinous errors assigned by counsel are discussed under various headings, the first being that the evidence affirmatively shows that the plaintiff assumed the risk of the accident resulting in his injury.

In actions under the federal act the defense of assumption

of risk must be applied as construed and defined by the
decisions of the federal courts. *Seaboard Air Line R.*          1
*R.* v. *Horton,* 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed.
1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475. It is said in
Roberts, Injuries to Interstate Employés, § 98:

> "Under the rulings of the United States Supreme Court an
> employé of a railroad engaged in interstate commerce, whether he
> is actually aware of them or not, assumes such damages and risks
> as are ordinarily incident to the employment. And he also as-
> sumes the risks due to the negligence of his employer when he
> becomes aware of the defect and the risk arising from it, or when
> such defects and risks are so open and obvious that an ordinarily
> prudent person would have observed and appreciated them, and
> then continues in the service without complaint." *Gila Valley &
> G. N. R. Co.* v. *Hall,* 232 U. S. 94, 34 Sup. Ct. 229, 58 L. Ed. 521;
> *Seaboard Air Line* v. *Horton,* 233 U. S. 492, 34 Sup. Ct. 635, 58
> L. Ed. 1062; L. R. A. 1915C, 1 Ann. Cas. 1915B, 475; *Texas & Pa-
> cific R. Co.* v. *Swearingen,* 196 U. S. 51, 25 Sup. Ct. 164, 49 L. Ed.
> 382; *Choctaw, O. & G. R. Co.* v. *McDade,* 191 U. S. 64, 24 Sup. Ct.
> 24, 48 L. Ed. 96; *U. P. R. Co.* v. *O'Brien,* 161 U. S. 451, 16 Sup. Ct.
> 618, 40 L. Ed. 766; *Schlemmer* v. *B. R. & P. R. Co.,* 220 U. S. 590,
> 31 Sup. Ct. 561, 55 L. Ed. 596.

The negligence of having the switch stand in unusual prox-
imity to the track so that there was danger that employés
riding on the side of box cars passing the switch stand would
be likely to be struck and injured was not a danger or
risk ordinarily incident to the employment in the rail-          2, 3
road yards. The crucial question for the jury was, and
the crucial question here is: Did plaintiff know that the
switch stand was too near the track, or was the location of
the switch stand, and, considering its height, was its unusual
proximity to the track, so plain and obvious that the plaintiff
must be presumed to have known and appreciated the danger
out of which the accident arose?

The facts in this case may be summarized as follows:

The plaintiff entered the employment of defendant on July
4, 1920, in the capacity of a switchman in defendant's yard
at Ogden, Utah. Prior to that he had worked in the train
service for 10 years on various railroads. He worked as a
switchman about one month for defendant and was then
promoted to engine foreman, in which position he had charge

of the crew, in which, besides himself, were two switchmen, an engineer, and a fireman. He worked in this capacity until some time in October, 1920, when he laid off until about the middle of January, 1921, because of sickness. About 10 days or 2 weeks before he was injured he was given charge of what is called the rip track engine, at which he was working at the time of the accident. Prior to that time he had not worked in that part of the yards and was not familiar with that locality. He worked an 8-hour shift—from 6 p. m. to 2 a. m. During the time he was engaged on this track all his work was done at night. He and the men under him used lanterns to give signals. The work of plaintiff at this time consisted of taking from the rip track the cars that had been repaired and were ready to return to service, and, after putting them in their proper place in the yard, to return bad order cars for repairs.

The yards are extensive, covering more than 640 acres, and they contain hundreds of switches used in connection with the different train operations by the different crews. The rip track was used by the car repairers for repairing cars. To protect the men engaged in that work there was a derail switch so arranged that a "toad," consisting of a piece of iron, could be placed upon the track and thus prevent any car from going upon the repair track. At 6 p. m. the car repairmen themselves would unlock the switch and from then on the rip track was open for receiving repair cars. The base of the derail switch was fastened to an extension of one of the ties, and from the base a rod extended upward about 5 feet. Near the top was a target and on top of the target was a lamp which projected toward the track 2 or 3 inches from the staff upon which it was fastened. This lamp was lighted during the nighttime to show whether the "toad" was on the rail or not, and to indicate the location of the switch stand. Some of the witnesses placed the distance of the stand from the rail at about 40 inches, but according to the general track foreman the distance was about 4 feet 5 inches from the center of the staff to the outside of the rail; from the lamp to the rail practically 4 feet. There was no other switch stand in the yard of the same height that was as close to the track.

All others that were as close were either ball or ground switches and were so arranged that men, while riding on the side of a car, would pass above them and would not be injured in their work. All other switches having a staff of this height averaged about 6 feet from the track.

The cars that plaintiff and his crew would bring to the rip track varied in width from 9 feet 8 inches to 10 feet 5 inches. Some of the large cars would project over the track more than 2½ feet, sometimes leaving a clearance of less than 20 inches. Sometimes the men would ride on the side of the cars, sometimes on top, and at other times on the footboard of the engine. Several witnesses testified that, when riding on the side of cars at that place, they had been struck or caught by the staff and knocked from the cars.

Between 8 and 9 o'clock on the evening of February 22d, plaintiff and his crew were bringing in four bad order cars to leave on the rip track. Plaintiff was walking toward the rip track, where the cars were to be spotted, when these four cars were being pushed upon the track by the engine; plaintiff got on the side of one of the cars in such position that he could signal to the engineer and at that time the switch stand struck him about the hip, knocking him to the ground and causing the injuries complained of. Three days afterwards the defendant ordered the switch cut down, thereby making it safe. According to the testimony of the plaintiff, this was the first time he had ever ridden past the switch on the side of a car. He had usually walked down the rip track lead or the roundhouse lead, or else had ridden on the top of a car or on the footboard. He believed this switch stand was the same distance from the track as all others in the yard. He testified:

"I didn't pay any particular attention to that switch, no more than I did any other switch. I supposed there would be enough clearance. I didn't know it was as close as it was. I didn't know anything about it. In the progress of my work I didn't have time to step through those and see their clearance. * * * I had seen the switch there the same as I had seen switches all over the yard. I supposed there was enough clearance there for a man to get through and do his work in. There was not enough clearance riding on a car * * * to pass by this switch. I don't

know as I had ever gone through there before on the side of a car. I usually ride sometimes down there, maybe there on top, or there on the hind end of the engine. It is a straight shove all the way down there, and I naturally get up and set down in a comfortable position; no use hanging on and riding when you can ride on top and sit down."

Again, he said:

"I had never worked there in the daytime, and never went there in the daytime, not till after 6 o'clock. At 6 o'clock, in February, it is getting dark. We have to use a light. We always lit our lights before we started down there. I don't know whether it was necessary to have to use one, but coming down them tracks with the smoke settling around there you can't see very far without a lamp. An ordinary switchman's lantern throws a light far enough that you can see the signal quite a ways. I don't suppose it would be used in the middle of the day February 22d, but at 6 o'clock we carried it down there. I carried a lamp and it was necessary in order to see and give signals. * * * On the engine this night I went in and got the O. K.'s out first. After that I took them down and went back and got some bad orders and brought them back. The whole time I worked there for two weeks I did that all during the 8 hours that I worked. That is all the work I did do on the shop engine, with the exception of incidents now and then. Williams always opened that derail switch at night when we started to work and it was left open. I would always ask him if he lined the derail so as to keep from going on the ground there. * * * I would see him throw it, from * * * about 15 or 20 steps. * * * I knew where the derail—I knew its position. I didn't know about how far it was from the track approximately. I never did examine it; I don't know how far it was. At that time I didn't know how high it was. I did afterwards. * * * I didn't know it was closer than any other until I got hit with it; I supposed it was the same distance as the others, as the standard switches. I passed by it every night, time and time again. A standard switch is about 6 feet. I wouldn't know how far this one was before I got hit; I never noticed it until after I got hurt on it. After I got hurt on it I measured it and I think it was 4 feet 2 inches or 4 inches from the rail, and it was in that position the whole time I worked there."

A witness for defendant testified that plaintiff told him that the derail switch stand was very close, and he (the witness) would have to be careful. Plaintiff denied that he made any such statement to witness.

Defendant's claim adjuster testified that about two weeks

after the accident plaintiff signed a written statement in which he said in part:

"During the time I had been on the shop engine I had to throw this switch A, the derail switch, almost every night, and then, too, in the course of doing the work I had observed that the switch stand was not proper clearance. I should say not to exceed 20 inches clearance, and then, too, I had noted that the switch stand was about a half a standard or about high enough when on the side of a car to catch one about the hips."

Plaintiff admitted he signed the statement, but denied that he made the admissions above set out. He denied having read the written statement and denied having heard it read. The claim adjuster was corroborated by another witness, who said that the adjuster read the statement to plaintiff and that plaintiff also read it himself.

The evidence was thus in sharp conflict. The testimony adduced by defendant would have sustained a verdict in its favor on the ground that the plaintiff had assumed the hazard of an obvious danger, but it was for the jury to weigh the testimony and determine what the truth was. When there is substantial evidence in support of every essential fact necessary to be established for a recovery, this court is precluded from interfering with the verdict.

Assumption of risk is an affirmative defense, and the burden of proof is upon the defendant. *Seaboard Air Line* v. *Moore*, 228 U. S. 433, 33 Sup. Ct. 580, 57 L. Ed. 907. Whether defendant established its defense by a preponderance of the evidence was clearly a question for the jury. For the trial court to pass upon the conflicting evidence as a law question would have been invading the province of the jury.

In *Texas & Pacific R.* v. *Swearingen*, 196 U. S. 51, 25 Sup. Ct. 164, 49 L. Ed. 382, it was held that where a switchman in defendant's yards was injured by being struck from the side of a car by contact with a scale box $18\frac{1}{2}$ inches from the side of a freight car moving on a track, the question of whether he assumed the risk was for the jury. The employé knew of the location of the box and the danger from contact with it, but did not know it was so near it could not be passed without danger in the performance of his duty.

The assignments relating to the exclusion of evidence are not of sufficient importance to require discussion. Conceding for the sake of argument that the rulings complained of were erroneous, the excluded evidence was too unimportant to constitute a basis for reversible or prejudicial error. If every technical error committed by a trial court during the progress of a hotly contested trial were to be treated as ground for reversal, few judgments would stand, and litigation would be endless.

A number of the instructions to the jury are criticized by counsel. One of the instructions claimed to constitute reversible error is as follows:

"You are instructed that the defendant claims that the plaintiff is not entitled to recover on the ground that he assumed the risk of being injured by coming in contact with the switch stand. Upon this point you are instructed that if you believe from a preponderance of the evidence that prior to the accident the plaintiff knew the location of the switch stand, and of the danger of being injured by coming in contact with it while in the performance of his duties (if danger there was), then the plaintiff assumed the risk of the accident and would not be entitled to recover. But in this connection the court further instructs you that the plaintiff is not chargeable, as a matter of law, with knowledge of the danger (if danger there was) by the mere fact that he knew of the existence and location of the switch stand; whether he knew of the danger, if any, which the unusual proximity of the switch stand to the rail created, is a question of fact for you to determine from all the evidence in the case, and if the preponderance of the evidence fails to show that the plaintiff knew of such danger and that such danger was so obvious and apparent that he must of necessity have known of it, the plaintiff's claim cannot be defeated on the ground that he assumed the risk of the accident."

The first objection is to the words "the unusual proximity of the switch stand." The evidence shows that considering its height the switch stand was dangerously near the track, and the court might well have found that fact as a matter of law. This instruction, however, was not the only one referring to the proximity of the switch stand. In another instruction the court said:

"You are instructed that the burden of proof is upon the plaintiff to establish by a fair preponderance of the evidence that the accident and injury to the plaintiff was due to the carelessness and

negligence of the defendant in erecting and maintaining the switch stand too close to the track known as the shopyard lead, and that such negligence was the proximate cause of the plaintiff's injuries, and, unless plaintiff has so established by a fair preponderance of the evidence to your satisfaction, he is not entitled to recover, or if you find that the weight of evidence upon this issue is in favor of the defendant, or that it is equally balanced, your verdict must be for the defendant."

In at least two other instructions the question of the proximity of the switch stand was submitted to the jury. If there was error in the instruction complained of it was cured by the other instructions referred to, as the charge to the jury must be considered as a whole.

It is claimed that the court erred in using the word "and" instead of "or" in the following part of the instruction:

"If the preponderance of the evidence fails to show that plaintiff knew of such danger, and that such danger was obvious and apparent."

The word "and" obviously should have been "or." No exception was taken to the word "and" and the error can therefore be of no avail to defendant. We think, however, that it was not of sufficient importance to constitute reversible error. When an error is so insignificant that it was overlooked by alert and skilled counsel, it is certainly not of sufficient importance to deprive the defense of any substantial right.

The words "that he must of necessity have known it" are the basis of the next objection. The language usually is that "he must be presumed to have known it." We apprehend that to the average juror one phrase would be as enlightening as the other. The difference between the two is infinitesimal. The instruction is further claimed to be erroneous, because it states that—

"The plaintiff is not chargeable, as a matter of law, with knowledge of the danger (if danger there was) by the mere fact that he knew of the existence and location of the switch stand."

The particular language objected to is the expression "as a matter of law."

In an instruction approved in the Swearingen Case, 196

U. S. at p. 63; 25 Sup. Ct. 168, 49 L. Ed. 382, a case which in its facts is similar to the one at bar, the following occurs:

"In this connection you are further instructed that the mere fact that the plaintiff knew of the existence and location of the scale box would not, as a matter of law, charge him with knowledge of the danger, if such danger there was, due to its proximity to the north rail of track No. 2, and whether he knew of the danger is a question of fact for you to determine from a consideration of all the facts and circumstances in evidence."

On the measure of damages, the court gave the following instruction:

"You are instructed that if you find for the plaintiff you will be required to determine the amount of his damages, and in this connection you are instructed that it is not disputed that, as a result of the injuries to the plaintiff, four fingers on his left hand have been amputated, and that such injuries are permanent.

"In determining the amount of damages, if any, the plaintiff is entitled to recover in this case, you have a right to and should take into consideration all of the facts and circumstances as shown by the evidence bearing upon the nature and extent of the injuries, his suffering in mind and body, if any, directly resulting therefrom and such suffering, if any, as you may believe from the evidence he will sustain in the future by reason of such injuries, his loss of time, and inability to work, if any, on account of such injuries, and whether his injuries will impair his future earnings; and you should then award him such damages as in the exercise of sound discretion you deem will be fair and just compensation to him for the injuries sustained; diminishing his damages as in these instructions explained, if you find him guilty of contributory negligence, but you are not to diminish the amount of damages unless you find he was guilty of contributory negligence."

The criticism is that the above contains no limitation on the award or damages the jury might give by reason of any diminution in plaintiff's future earnings by reducing such amount to its present worth. Citing *C. & O. R. Co.* v. *Kelly*, 241 U. S. 485, 36 Sup. Ct. 630, 60 L. Ed. 1117, L. R. A. 1917F, 367, which supports their contention, counsel say:

"The measure of damages under the federal Employers' Liability Act must be settled according to the general principles of law as administered by the federal courts, and the federal courts hold that, where future payments are to be anticipated and capitalized in a verdict, the plaintiff is entitled to no more than their present worth."

Had the court instructed the jury to find the present value of the loss of plaintiff's earnings, and had the jury been furnished approved mortality tables and a standard discount table, the verdict would probably have been more than $10,000. Plaintiff claims permanent disability, totally incapacitating him from manual labor, and therefore claims that due to his injuries his loss of wages amounts to $2,500 per year. Undoubtedly he can find something to do and can earn something, so let us arbitrarily assume his annual loss to be $1,200, instead of $2,500. When injured the plaintiff was 31 years old. According to the American Experience Tables his expectancy of life is 34.62 years. On a 6 per cent. basis the present value of $1,200 payable each year for 34 years is $17,241.60, as we figure it, and the jury would probably have found some such amount if instructed on the subject and furnished with the necessary mathematical data for their guidance. The conclusion seems unavoidable that the omission of the court to instruct the jury to find the present value of the plaintiff's loss of earnings was helpful rather than harmful to defendant.

Another reason why the omission of the court to charge the jury on the subject of the present worth of plaintiff's loss of earnings is not reversible error is that defendant made no request for such an instruction. It is a well-settled rule in this jurisdiction that partial noninstruction or omission to charge as to a particular issue does not constitute reversible error in the absence of a specific request for a more specific and comprehensive instruction. Such also is the rule in the federal courts. *Backus* v. *Fort St. U. D. Co.*, 169 U. S. 557, 18 Sup. Ct. 445, 42 L. Ed. 853, and cases cited.

Further assignments of error relating to instructions are not of sufficient gravity to require discussion. A careful examination and study of the court's charge to the jury convinces us that it is without reversible error, and that it was fair to the defendant as well as to the plaintiff.

It is insisted that the verdict for $10,000 is excessive. In *Shepard* v. *Payne,* 60 Utah, 140, 206 Pac. 1098, this court

held, in effect, that $2,500 of a $10,000 verdict was excessive as a matter of law. The language in the opinion in that case seems not to have been well chosen. We now take occasion to say that verdicts will not be interfered with by this court on account of being excessive unless the facts are such that the excess can be determined as a matter of law, or that the verdict is so excessive as to be shocking to one's con-  **17, 18** science and to clearly indicate passion, prejudice or corruption on the part of the jury. When a verdict is so excessive that it clearly indicates passion and prejudice, a new trial should be granted unconditionally. If the trial court thinks, after seeing and hearing the witnesses and weighing the evidence, that the verdict is excessive, it may, in the exercise of a sound discretion, reduce the verdict, and if the reduced amount is not acceptable to plaintiff may grant a new trial, and unless an abuse of discretion is shown such action by the trial court is not subject to review.

Verdicts rendered 10, 15, or 20 years ago are of little help in determining what amount is now excessive in a personal injury case. The present cost of living must be considered, and the diminished purchasing power of the dollar must be taken into consideration when estimating damages. In *Coke* v. *Timby*, 57 Utah, 53, 192 Pac. 624, it is said:

"A few years ago such a sum might not have been awarded by a jury, but in this day of high prices the amount awarded cannot be said to be excessive."

In the Shepard Case, supra, the verdict was reduced to $7,500 from $10,000. Shepard's injuries consisted of a fracture of the wrist, the joint being practically solid and motionless. The muscles that extend the fingers were contracted. He could not use the hand for manual labor. He was a section foreman, 50 years of age, and when injured was earning $105 per month in addition to being furnished with fuel, light, and a house. The plaintiff in the present case was injured so that he can never perform the work of a switchman. At the time of the accident he was 31 years of age and was earning $200 per month. He testified that—

He could not hire out in any job of railroading. "I don't know as I could handle a lamp and get hold of a ladder with this hand

at all. I can get hold of a piece of something with this hand, but this part won't close up. There is nothing to close if I put it between the stump and this finger. There is no work that I have done outside of the railroad work. I don't know of any manual labor that I can perform with that hand in its present condition. If there was any, I would be trying to do it. Since the 22d of February of last year I have not been able to earn any money and have not earned any. I don't know what it would be that I could do with that hand."

Referring to his hand, he further said that—

Where the hand was injured it was just like touching a live wire when he touched his clothes, "always has been; the nerves were left exposed there and I cannot touch it. It is painful if I touch anything with that hand; the nerves are so bare it is just like touching a live wire and causes the hand to jerk. * * * This has been the condition ever since I was discharged from the doctors. I don't know as my condition is improved in the last six months or not. It is just about the same as it was. I am acquainted with railroad work, and have never had any training for any other work."

His injuries, as he described them, were:

"My left hand shows that the little finger, the next one to it, and the middle finger have been taken out at the last joint. Practically all the index finger is taken off about half an inch from where it joins the hand, less than half an inch."

It is apparent that, if $7,500 was not excessive and unreasonable in the Shepard Case, it cannot be said that $10,000, though a liberal award in this case, is excessive as a matter of law.

Judgment affirmed.

GIDEON, THURMAN, and CHERRY, JJ., concur.

FRICK, J., did not participate.