## MORGAN v. OGDEN UNION RY. & DEPOT CO.

No. 4965. Decided January 5, 1931. (294 P. 541.)

*Geo. H. Smith, J. V. Lyle, R. B. Porter*, and *W. Hal. Farr*, of Salt Lake City, for appellant.

*Willard Hanson, A. H. Hougaard,* and *K. C. Tanner,* all of Salt Lake City, for respondent.

EPHRAIM HANSON, J.

The plaintiff brought this action under the Federal Employers' Liability Act (45 USCA §§ 51-59) to recover damages for personal injuries sustained by him while he was employed by the defendant in interstate commerce. The case was tried to a jury, and resulted in a verdict and judgment for the plaintiff in the sum of $15,000. The defendant appeals.

For a reversal of the judgment, the defendant presented several assignments of error, but the only assignments that were considered or discussed in its brief or in the oral argument related to the court's refusal (1) to direct a verdict for the defendant, and (2) to grant a new trial.

1. The assignments of error relating to the refusal of the court to direct a verdict for the defendant are predicated on the proposition which we here quote from appellant's

brief: "That the evidence showed clearly that the plaintiff realized the danger involved in the work that was being done and therefore assumed the risk as a matter of law."

To fairly understand the force of this contention, a statement of the salient facts will be necessary. It is admitted by the defendant that it was engaged in the railroad business as a common carrier, that it owned and operated various railroad tracks in Ogden, Utah, upon which it switched cars and trains in interstate commerce, and that the plaintiff worked for the defendant as a switchman. Further, the evidence, without contradiction, shows that at the time of his injury the plaintiff and the crew to which he belonged were in the act of switching an interstate car from track No. 4 to the Denver & Rio Grande transfer track. In furtherance of this purpose, the car had been brought from the No. 4 track on to the main track or lead. The engine foreman who was in charge of the crew and directed this work decided to transfer the car to the Denver & Rio Grande transfer track by means of a flying or drop switch. This consisted of running the engine up to a desired speed and then uncoupling it from the car so as to permit the engine to proceed along the main tracker lead at an increased speed past the switch, whereupon the switch was thrown so as to divert the car to the transfer track. This was done, but the switchman riding the car applied the brake too soon, and the car did not proceed far enough past the switch so as to be in the clear of the engine and cars passing along the main lead. The engine foreman decided to push the car back on the main lead and start the drop over again. As the engine was on the main lead and the car on an adjoining track, it was necessary to use a pole to reach across from the engine to the car. The engine foreman brought an ordinary railroad tie for that purpose. The tie was eight feet long and eight by eight inches square. The engine foreman put one end on the pin lifter of the car, and told the respondent to hold the other end so that as the engine came up slowly he could put it against the buffer

beam of the engine toward the side nearest the car. With the tie in that position, it was thought the car would be pushed back on the main lead. This attempt failed. The engine struck the tie with such force as to drive the car back about two feet, and the end of the tie resting on the pin lifter of the car fell to the ground. By direction of the foreman another attempt was made.

There is a direct conflict between the testimony of the respondent and the engine foreman in reference to many phases of this second attempt to pole the car. There is evidence, however, tending to show that the engine and the car were closer together than they were on the first occasion, so that the respondent could not stand on the outside of the track and hold the tie in such a position that as the engine came slowly forward the tie would come in contact with the outer end of the buffer beam as it had done in the first instance, and that the respondent had requested the foreman to have the engine moved back so that it could be done in that way. The engine foreman instead told the respondent to hold the tie toward the center of the engine alongside of and next to the draw bar of the engine. To do this it was necessary for the respondent to stand between the rails in front of the engine. Respondent testified that he was directed by the foreman to hold the tie in that position until the engine could be brought slowly forward against the tie, and until sufficient pressure had been brought against it to hold it in place; that the engine foreman said he would then have the engine stopped so that respondent could get in the clear. There is evidence tending to show that to do this the engine would have to be brought forward very slowly for about six inches and then stopped; there is substantial evidence tending to show that this could have been done had the engine foreman given the proper directions and signals to the engineer. The engineer was called as a witness for appellant, and on his direct examination testified that with the kind of an engine they had "you should be supposed to stop within an inch"; that he had

poled cars a number of times, and, if proper directions and signals are given, it is a simple matter to control the engine. In this particular instance, after getting the signal to move forward, he testified that he continued to go forward, and did not receive another signal from the engine foreman until he had received the "washout," and he then stopped the engine. There is evidence to the effect that before the engine began to move forward the car was approximately three feet from the engine, and that, when the engine was brought forward, it hit the tie with such force that it drove the car forward three or four feet. It is conclusively shown that the engine continued to move forward until it caught the respondent's foot between the buffer beam of the engine and the car. According to this evidence, the engine moved forward at least from six to seven feet before it was stopped. Respondent testified that he relied upon the assurance which he said had been given to him by the engine foreman that the engine would be brought forward very slowly until it came in contact with the tie, a distance of six inches, and then stopped so that respondent could get out from between the engine and the car. Instead of the engine being brought forward very slowly, it came with such force as to drive the car from three to four feet by the impact, causing that end of the tie to fall to the ground. The respondent further testified that, as the engine did not stop, he let the tie fall, and to avoid being run over he jumped on the running board of the engine; and, as the engine had gotten so close to the car, grabbed the brakestaff on the car and attempted to pull himself up so that he would be above the buffer beam of the engine as it came in contact with the car. In this he almost succeeded, but his right foot was caught and badly crushed. The testimony shows without dispute that the engine foreman directs the work of the switching crew, and that the engineer stops and starts the engine only upon signals from the foreman.

From the foregoing statement we think there was ample evidence to warrant the jury in finding that the appellant

was negligent (1) in that the engine was permitted to strike against the tie with an excessive and unnecessary amount of force, thereby driving the car back three or four feet by force of the impact and causing the tie to fall from the car to the ground; (2) after the tie had fallen to the ground, in permitting the engine to move forward at least six or seven feet before it was stopped when the respondent was in a position of peril and all the while in plain view of the engine foreman; and (3) in the neglect and failure of the engine foreman to signal or otherwise direct the engineer to stop the engine as soon as it had been brought forward far enough so as to firmly brace the tie between the engine and the car—which, as we have already stated, was six inches according to respondent's testimony —in order to give respondent an opportunity to get in the clear. It is also apparent that the negligence of the appellant in the foregoing particulars was the direct and proximate cause of respondent's injury. Of this the appellant does not make any serious contention to the contrary. Nor is it disputed that there was sufficient evidence of the appellant's negligence in the particulars mentioned to sustain the verdict. The appellant rests its defense solely on the ground that the respondent realized the danger involved in the work he was doing, and therefore he assumed the risk as a matter of law.

No claim is made by appellant that the respondent's injury was the result of any risk ordinarily incident to the work he was doing.

The rule relating to the assumption of extraordinary risk arising from the negligence of the employer or those representing him as applied by the Supreme Court of the United States in actions brought under the Federal Employers' Liability Act is stated in the case of *Chesapeake & O. R. Co.* v. *De Atley*, 241 U. S. 310, 315, 36 S. Ct. 564, 566, 60 L. Ed. 1016, as follows:

"It is insisted that the true test is not whether the employee did, in fact, know the speed of the train and appreciate the danger, but

whether he ought to have known and comprehended; whether, in effect, he ought to have anticipated and taken precautions to discover the danger. This is inconsistent with the rule repeatedly laid down and uniformly adhered to by this court. According to our decisions, the settled rule is not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employee may assume that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them."

It is well settled that the basis for charging an employee with assumed risk is knowledge by him of the risk and an appreciation or comprehension of the attending danger. If the risk is ordinarily incident to the employment, the employee is held to a presumption of such knowledge and a comprehension of the danger attending it by reason of his contract of employment whether he has actual knowledge of it or not. If the risk is extraordinary or unusual, or if it is one created by the negligence of the employer or one representing him, the risk is not assumed, unless it is known to, and appreciated by, the employee, or it is so open and obvious as to presume knowledge. *Roach* v. *Los Angeles & S. L. R. Co.* (Utah) 280 P. 1053.

There is evidence from which the jury might properly find that the respondent was directed by the engine foreman to stand between the rails of the track in front of the engine and to hold the tie, and that the engine foreman told the respondent that the engine would be moved slowly forward against the tie with sufficient pressure to hold it in place; that he would then stop the engine to enable the respondent to get in the clear. There is also evidence to warrant a finding that it was because of such assurance that respondent undertook to stand in that position. There is evidence that all this could be done without exposing the respondent to any very serious danger, had proper signals and directions been given to the engineer

and such signals and directions had been followed. In considering the question of whether respondent should be charged with the assumption of the risk, we must treat the foregoing evidence at this time as settled by the verdict in favor of the respondent.

If we now apply the principles announced in the foregoing authorities to the facts in this case, the respondent had the right to assume that the engine would be moved forward very slowly so as to engage the end of the tie held by him with only such force as was necessary to firmly brace the tie in position; that the engine foreman would then signal the engineer to stop the engine in order to give respondent an opportunity to get out of the way. He had no notice or warning of the failure of the engine foreman to signal the engineer to stop the engine. As he had no knowledge of the engine foreman's neglect in this regard, he had no knowledge of the extraordinary risk arising therefrom, and, without knowledge of the risk, he, of course, could not judge or appreciate the attendant hazard. Neither can it be said that the risk created by such neglect was so open and obvious as to presume knowledge. The neglect of the engine foreman to give the signal brought about a sudden emergency, and there was no opportunity for the respondent to acquire knowledge of the risk thereby created, and hence no opportunity to judge of and appreciate the danger. Clearly under the situation the doctrine of assumed risk can have no application. It is so held by the Supreme Court in the case of *Chicago, R. I. & P. R. Co.* v. *Ward,* 252 U. S. 18, 40 S. Ct. 275, 276, 64 L. Ed. 430. Ward was a switchman riding a cut of cars that had been pushed up an incline over an elevation. It was the duty of the engine foreman to uncouple the cars from the engine in order that Ward might gradually stop them by applying the brakes. As the cars ran down the track, the slack between them was gradually being taken up by the cars pulling farther apart. The engine foreman failed to cut off the cars, and directed the engineer to retard the speed, thereby causing

the cars to slow down in such manner that, when the check reached the car on which Ward was about to set the brake, he was suddenly thrown forward from the top of the car, resulting in his injuries, for which action was brought. The court held:

"This situation did not make the doctrine of assumed risk a defense to an action for damages because of the negligent manner of operation which resulted in Ward's injury. * * * It was a sudden emergency, brought about by the negligent operation of that particular cut of cars, and not a condition of danger, resulting from the master's or his representatives' negligence, so obvious that an ordinarily prudent person in the situation in which Ward was placed, had opportunity to know and appreciate it, and thereby assume the risk."

To the same effect is the case of Reed v. Director General, 258 U. S. 92, 42 S. Ct. 191, 192, 66 L. Ed. 480. The decedent was a member of a train crew. A caboose was being pushed through the yards of the defendant. On many of the tracks a derailing device was set. In moving through the yards with the caboose in front of the engine the engineer could not see the device from his cab. The decedent was directed to and did locate himself on the front of the caboose, with a duty to signal the engineer in time for him to safely stop if the derailing device was set against further passage. It was so set. Either through the negligence of the decedent himself or of the engineer in failing to notice or heed the signaling of the decedent, the locomotive did not stop in time, the caboose was derailed, and the decedent crushed. Accepting the view that the engineer's negligence was the proximate cause of the fatal injury, the Supreme Court of the state, 267 Pa. 86, 110 A. 254, 255, reversed a verdict and judgment in favor of the plaintiff on the ground that decedent had assumed the risk of such negligence. The court gave as its reason for so holding that the "decedent knew of the risks he assumed in the movement of the engine and caboose through the yard; he knew the place was a dangerous one; he knew that if he did not warn the engineer in time, or if the latter did not see or heed the signals, the

engine and caboose would be derailed," with probable injury.

The Supreme Court of the United States, in reversing the Supreme Court of the state, said:

"In actions under the federal act the doctrine of assumption of risk certainly has no application when the negligence of a fellow servant which the injured party could not have foreseen or expected, is the sole, direct, and immediate cause of the injury."

In the case of *Chesapeake & O. R. Co.* v. *Proffitt*, 241 U. S. 462, 36 S. Ct. 620, 622, 60 L. Ed. 1102, the court said:

"Even if plaintiff knew and assumed the risks of an inherently dangerous method of doing the work, he did not assume the increased risk attributable not to the method, but to negligence in pursuing it."

We therefore conclude that the court quite properly under the facts in the case left the question of respondent's assumption of the risk to the jury under proper instructions in reference to the same.

II. Appellant assigns as error the court's refusal to grant a new trial because the verdict was excessive.

Comp. Laws Utah 1917, § 6978, provides as one of the grounds for which a new trial may be granted: "Excessive damages, appearing to have been given under the influence of passion or prejudice."

It is insisted that $15.00 is excessive. Respondent when injured was twenty-five years of age, and was earning $200 per month. His foot was amputated through the instep, the heel only remaining. He suffered considerable pain. After fifty days in the hospital he was permitted to walk on crutches. He can no longer do yard work, such as switching or braking.

The question has been before this court a great number of times, and we have uniformly held that we are permitted to interfere with the verdict on this ground only when the facts are such that the excess can be determined as a matter of law, or that the verdict is so excessive as to shock one's

conscience and to clearly indicate passion, prejudice, or corruption on the part of the jury, and that the trial court, in passing on the question, clearly abused its discretion in permitting the verdict to stand. *Brostrom* v. *Lynch-Cannon Eng. Co.*, 46 Utah 103, 148 P. 423; *Eleganti* v. *Standard Coal Co.*, 50 Utah 585, 168 P. 266; *McAfee* v. *Ogden Union Railway & Depot Co.*, 62 Utah 115, 218 P. 98.

We have examined the record very carefully. There is nothing .disclosed that would tend to engender the bias, passion, or prejudice of the jury. In passing on this question, the learned trial judge said:

"In this case the jury was rather an exceptional jury. The men appeared to be of rather a high type. The jurors were accepted by both parties. The case was carefully and quietly tried and argued without any appeal that might be said to affect the feelings, the bias or prejudice of any of them. The court is unable to find any reason as a matter of law why the verdict of the jury should be disturbed."

With this conclusion we concur. The motion for new trial was properly denied.

JUDGMENT AFFIRMED; costs to respondent.

CHERRY, C. J., and STRAUP, ELIAS HANSEN, Jr., and FOLLAND, JJ., concur.